IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

VANCE HASKELL,                    )
                Petitioner,       )
                                  )
        v.                        )        Civil Action No. 10-149 Erie
LOUIS FOLINA,                     )        Magistrate Judge Susan Paradise Baxter
et al.,                           )
                Respondents.      )


## OPINION[1]


Presently before the Court is the Amended Petition For a Writ of Habeas Corpus filed by state

prisoner Vance Haskell ("Petitioner" or "Haskell") pursuant to 28 U.S.C. § 2254. In his petition,

Petitioner raises five claims for relief (four of which revolve around the trial testimony of a single

prosecution witness, Antoinette Blue). Petitioner makes the following claims:

| | | |
|---|---|---|
| Claim A | | The Commonwealth violated Petitioner's due process rights because it knowingly presented false testimony from Antoinette Blue |
| Claim B | | The Commonwealth violated Petitioner's due process rights by committing a Brady violation because it suppressed evidence related to criminal charges pending against Antoinette Blue in Mercer County, Pennsylvania |
| Claim C | | Direct appeal counsel was ineffective for failing to file a petition for allowance of appeal with the Supreme Court of Pennsylvania following the Superior Court's 1999 decision affirming his judgment of sentence |
| Claim D | | The photographic line-up shown to Antoinette Blue was suggestive and, as a result, her in-court identification of Petitioner violated his due process rights |
| Claim E | | Trial counsel was ineffective for failing to: (i) renew the motion to suppress following Antoinette Blue's trial testimony; and (ii) adequately cross-examine Blue to reveal the inconsistencies between her testimony |

_____

[1]     In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties have voluntarily consented to have a
United States Magistrate Judge conduct proceedings in this case, including entry of a final judgment.

and the testimony of other witnesses, and to impeach her with inconsistent
statements that she made at the preliminary hearing

(ECF No. 41 at 14-32).

For the reasons set forth below, all claims in the Amended Petition are denied. A certificate of

appealability is denied.

**I.**

## A. Background[2]

### The Shooting and the Investigation

Early in the morning of December 10, 1994, more than 150 people were at Jethroe's Steakhouse,

a bar located in Erie, Pennsylvania. At around 1:23 a.m., a man pulled out a semiautomatic weapon and

fired it approximately 14 times. The weapon used was referred to in Petitioner's subsequent trial as an

"Uzi." Darrell Cooley was shot at least nine times and died. Kevin Twillie was shot in the arm but did

not suffer life-threatening injuries. The shooter and another man, later identified as Curtis Mathis[3] (also

known as "Troy"), ran from the bar together. When the police arrived at the scene, the shooter was gone.

The police soon suspected that Petitioner, who was from Rochester, New York, might be the

shooter. During their investigation, the police learned that Petitioner and Mathis often stayed at the

home of Felicia Clark, who lived at the Franklin Terrace housing project. Felicia Clark testified at

---

[2]     Some relevant state court records have been filed electronically by the parties. Those documents are cited herein
using their Electronic Court Filing ("ECF") docket number. Respondents also have submitted hardcopies of the documents
that were filed in the Court of Common Pleas of Erie County in Petitioner's underlying criminal case. The first set of these
documents were filed prior to this case being stayed in 2012. They are indexed and numbered 1 through 72 and are cited as
"SCR 1 at No. __ ." Also included in this file are the suppression hearing and trial transcripts. After this case was reopened in
late 2013, Respondents filed a second set of state court records containing the documents filed in Petitioner's most recent
state post-conviction proceeding. Those documents are indexed and numbered 1 through 11 and are cited as "SCR 2 at
No. __ ." At the Court's direction, Respondents also submitted a DVD copy of Curtis Mathis's March 7, 1997, videotaped
statement, which was viewed by the jury at Petitioner's trial.

[3]     In some places in the record, Curtis's last name is spelled "Matthis."

2

Petitioner's trial that Petitioner and Mathis stayed at her home beginning around the end of November 1994. (Day 3 Trial Tr. at 114-16). Petitioner and Mathis had been brought there by Felicia's brother, Phillip Anthony Clark (also known as "Tony Clark" or "Tony Montana"). The police suspected that not long after the shooting, Tony Clark drove Petitioner to Rochester, New York, in a blue Dynasty vehicle. That car belonged to Tony Clark's uncle, Ernest Glover, who had traded vehicles with his nephew on December 9, 1994. Glover testified at Petitioner's trial that when Tony Clark returned the car to him two days later, it had been driven about 586 miles, a fact that supported the prosecution's theory that Tony Clark assisted Petitioner in getting out of Erie after he shot and killed Darrell Cooley and injured Kevin Twillie. (Day 4 Trial Tr. at 11). Glover gave police permission to search his vehicle and they found several empty beer bottles in it and fingerprints were taken from them. (Id. at 86-87). The police subsequently received confirmation that prints lifted from the beer bottles matched those of Petitioner. (Id. at 112-17). The police investigation of the December 10, 1994, shooting at Jethroe's stalled for several years. Individuals who had relevant information were hesitant to come forward and reluctant to cooperate with the police.[4]

### Mathis Comes Forward

In November 1995, Mathis was convicted of two counts of hindering apprehension in connection with his role as an accomplice in the shooting. He was sentenced to three to seven years of incarceration. At that time, Mathis apparently did not identify the shooter and Petitioner had not been charged with any crime.

---

[4] For example, at Petitioner's trial, Duane Beason, who knew both Mathis and Petitioner, testified that he saw Petitioner after the shooting when they were both in jail. (Day 3 Trial Tr. at 184). Beason testified that Petitioner told him that after he "beat" the charges against him, he would come back to Erie and confront those that "snitched" on him and that he "wasn't through" using his "AK [assault rifle]." (Id. at 185).

About a year later, in November 1996, Mathis wrote a letter to one of the primary investigators of the shooting, Detective Sergeant James Skindell, and indicated that he was ready to cooperate and give the police information about the shooting. (Day 3 Trial Tr. at 90-93). In exchange, Mathis wanted to be paroled. (Id. at 102-03). The Erie authorities told Mathis that, as consideration for his truthful cooperation, they would notify the parole board of his assistance but that they could not otherwise help him get parole. (Day 1 Trial Tr. at 26. See also Mathis 3/7/97 Statement, Commw's Trial Ex. 32).

Det. Skindell and other investigators interviewed Mathis several times. (Day 3 Trial Tr. at 93-94; Day 4 Trial Tr. at 68-69). On March 7, 1997, Mathis gave an approximately 45-minute videotaped statement in which he discussed what happened before, during and after Petitioner shot Darrell Cooley and Kevin Twillie at Jethroe's. Mathis explained that he first met "Hakeem" (Petitioner's alias) through Tony and Felicia Clark, and that he and "Hakeem" (as Petitioner was known in Erie) went to Jethroe's together the night of the shooting. (Mathis 3/7/97 Statement, Commw's Trial Ex. 32, at mins. 3-6, 12-32). Mathis stated that he did not see the actual shooting, but that immediately after the shooting stopped, he saw "Hakeem," who was wearing a green "puffy" coat that night, holding up a gun that was "smoking." Mathis said that he and "Hakeem" ran out of the bar together and that "Hakeem" discarded the gun in an alleyway in the area of Parade Street. (Id. at mins. 14, 22-25, 32, 45-46). He explained that he and "Hakeem" then went to a nearby bar and a woman there called them a cab. The cab driver dropped them off in the Franklin Terrace neighborhood and they ended up at a home with two women, one of whose name was "Pam." (Id. at mins. 26-28). Also recorded was Mathis being shown a photographic line-up in which he selected Petitioner's picture and identified him as the man he knew as "Hakeem." (Id. at min. 40).

The police continued to investigate the case and gather evidence to corroborate the information given to them by Mathis, among other individuals. In November 1997, Petitioner was charged with the murder of Cooley, the aggravated assault of Twillie, unlawfully carrying a firearm, and related crimes.

**Petitioner's Trial -- Opening Statements**

The trial court appointed John J. Moore, Esq., to represent Petitioner. The five-day jury trial commenced on September 25, 1998. In his opening statement, the prosecutor, Matthew R. Hayes, Esq., warned the jurors that the case was complicated for a number of reasons. One reason, Hayes explained, was that many of the witnesses had credibility issues:

> You're going to hear from a number of people, unfortunately, that are not particularly the most sterling individuals in the community. Some of them are presently in jail. Some of them have done jail time. Some of them just may come across as not reputable, just not somebody you want to take home for dinner. That's something you're going to have to accept. We obviously don't pick and choose what witnesses see a particular crime. We go with the folks that are there, the folks that are at the establishment where the shooting takes place…. I'm going to ask you to keep an open mind…. Listen to what they're telling you. Listen … see whether that information fits in with all the other people.

(Day 1 Trial Tr. at 13-14). Another complicating factor was that many of the witnesses had been afraid to come forward with information and did not want to testify against Petitioner. (Id. at 16). Yet another complicating factor, Hayes stated, was the fact that by the time of the trial, almost four years had expired since the shooting. (Id.) Hayes also predicted that some of the testimony given by witnesses who were at the bar at the time of the shooting would not be entirely consistent, but he told the jurors that when they evaluated the evidence against Petitioner as a whole, they would learn the relevant facts of the shooting:

> These witnesses will tell you a lot of different things…. How often have you heard about ten witnesses that will see an auto accident and not one of them are the same?.... Even though there's no question they will be inconsistent on points, they will differ on points, they're not going to have the exact same story – quite frankly, I don't know that you'd want that. Why would you want to hear the exact same thing ten times? You'd think something was up. That's not what you're going to have here. You are going to have

5

people that tell you different things. But by and large there are some prevailing things throughout the information that you're going to get.

What you're going to hear is this: Most people agree that there's anywhere from four to ten shots. Those are shots in rapid [succession.]…

- - -

What you're also going to hear is that the shooting took place somewhere in this riser/stage area [indicating toward the diagram of the scene of the crime], somewhere up around here. Most people that you hear from are going to agree that that's where the shooting takes place. Most people are going to agree that the victim [Cooley] is somewhere in that area …. And by and large all of them will agree that once the shooting starts, the victim starts to run, … goes into the pool room, goes out these doors and collapses. And that's where his body is found, okay.

Most people agree that the shooter was either on that riser or very, very close to that riser and moved on to that area…. When he is done, he moves back and eventually goes out this backdoor. The witnesses that see the last portion tell you there's another individual that comes into play, a guy by the name of Curtis Matthis. We're going to talk a little bit more about him later on. But he, according to these witnesses, helps the shooter out of the bar, okay. This is what they're agreeing on. They also agree that this gun that's being used is a black gun, it sounds and it looks like an Uzi, okay.

The last thing that you're going to hear primarily is that several of the witnesses – not most but several – will specifically identify the defendant, Vance Haskell, as the shooter. Most, however, in addition to that will say that "I don't remember what this guy's face looked like but this is what I remember his description being."

(Id. at 19-20, 22-23).

Hayes also told the jurors that many witnesses will testify that the shooter was "wearing this big, puffy green coat. You're going to hear it in a lot of different ways. It's going to be called a puffy goose down coat, a large, puffy coat, sometimes will be called a 'bomber jacket.' But by and large they will all be fairly consistent about what this person's wearing." (Id. at 23).

Hayes next addressed Curtis Mathis and provided a lengthy summarization of the videotaped statement that Mathis gave on March 7, 1997. (Id. at 27-32). Finally, Hayes informed the jurors that Mathis had ceased cooperating with the authorities and had recanted his videotaped statement. (Id. at 32). Hayes told the jurors that they would find that the evidence the Commonwealth presents establishes that Mathis's videotaped statement should be credited. (Id. at 32-39).

**The Commonwealth's Case – Mathis's Recantation**

The Commonwealth called over 40 witnesses in its case-in-chief. The following is a summarization of some of the most relevant testimony. As Hayes anticipated, when Mathis took the stand as a prosecution witness, he did not give the same account that he gave in his videotaped statement. Mathis testified that he met Petitioner on several occasions beginning around November 1994. (Day 3 Trial Tr. at 80-81). He stated that he was at Jethroe's at the time of the shooting but did not say that he was there with Petitioner. (Id. at 82). Mathis testified that he did not see the shooting, did not see anybody with a gun that night, and that he left the scene in a car he drove himself. (Id. at 82-84. See also 88). Mathis testified that he drove his car to a place he referred to as the "Holly," and that he stayed there for several hours afterwards. He said the Holly is not in the Franklin Terrace housing project. (Id. at 88-89).

Because Mathis's testimony was inconsistent with his videotaped statement, the court permitted the Commonwealth to introduce the videotaped statement as substantive evidence to prove the truth of the matters asserted therein in accordance with Commonwealth v. Lively, 610 A.2d 7 (Pa. 1992) and Commonwealth v. Brady, 507 A.2d 66 (1986). (Id. at 85-87). Mathis's 45-minute videotaped statement was played for the jury in its entirety. (Id. at 84-88, 95-99).

**The Commonwealth's Case – Rehabilitation of Mathis's Videotaped Statement**

Numerous witnesses called by the prosecution corroborated Mathis's videotaped statement. As set forth above, Mathis said in his statement that Petitioner discarded the murder weapon in an alleyway in the Parade Street area. Frederick Lattanzie worked at Western Auto Transmission located at 18th and Parade Streets. He testified that in February 1996 he found an Uzi-type semiautomatic weapon wedged underneath a truck that was parked outside and was used for spare parts. (Day 4 Trial Tr. at 127-33). The

gun that Lattanzie found was turned over to the police and it was introduced at Petitioner's trial as Commonwealth Exhibit 17.[5] (Id. at 128). The owner of Western Auto Transmission, Thomas Skurka, testified that the truck had been parked outside the establishment for many years (id. at 137-38), so it would have been there on the date that Mathis said Petitioner discarded the murder weapon in the alley.

Although Mathis testified at trial that he drove himself from Jethroe's after the shooting, Darrell Gambel testified that, consistent with what Mathis had said his in videotaped statement, Mathis and Petitioner ran out the door of Jethroe's after the shooting and left the scene on foot. Gamble knew Mathis. They met in Philadelphia and Gamble spent time with him there. (Day 3 Trial Tr. at 119-21). Gamble testified that he was at Jethroe's the night of the shooting and that while there he played pool and drank with Mathis. (Id. at 121-22). Gamble said that he left Jethroe's about five minutes before the shooting and that when it happened he was in the parking lot. (Id. at 122-24). He stated that after the shooting "Troy [Mathis] and the defendant ran towards the back alleyway over that way [indicating at a diagram]." (Id. at 125). Gamble made an in-court identification of Petitioner as the man he saw running away from Jethroe's with Mathis. (Id. at 125-26, 135). He testified that Mathis and Petitioner were only inches away from his car and that he got a good look at their faces. Gamble also said that Petitioner was wearing "a big fluffy jacket." (Id. at 128).

Shelby Overton was a bartender at Jethroe's. (Day 3 Trial Tr. at 17). She testified that she did not see the actual shooting, but she did see the shooter right afterwards holding up a gun that looked like

---

[5]     State policeman Jack Wall testified as an expert in the field of firearm and tool mark examination. During the course of the investigation, he was asked to compare the recovered discharged bullets and cartridge cases with the gun found under the truck at Western Auto Transmission. Wall explained that when he received the firearm, which had been outside for quite some time, he noticed immediately that "it was in very poor condition. The interior of the bore had rusted very badly." (Day 4 Trial Tr. at 151). Because the corrosion obscured the original marks that had been left in the bore by the manufacturing process, Wall "was not able to come to any conclusion as to whether or not" the recovered bullets had been discharged from Exhibit 17. (Id.) Wall did explain, however, that the gun, the cases and the bullets were nine-millimeter and that "the class characteristics, the number of lands and grooves and the dimension of the lands and the – the grooves are the same. But, as far as matching these bullets individually to this firearm, I was not able to do it, nor was I able to exclude the bullets as being discharged from this firearm." (Id. at 151-52).

Exhibit 17. (Id. at 18-19). Although Overton could not identify the shooter, she did identify Mathis as the man she saw with the shooter and said that she served them drinks before the shooting. (Id. 18-20, 23). She also testified that the shooter was wearing a green goose down coat. (Id. at 21). Overton stated that after the shooting she saw Mathis "pushing [the shooter] out the door." (Id. at 20). According to Overton, as Mathis was pushing the shooter he was saying to the shooter "come on man, come on." (Id. at 25).

Many other witnesses provided corroborating evidence that Mathis and the shooter fled the scene together. Mary McLaurin also worked at Jethroe's. She said Mathis was at the bar that night and that he was with a man wearing a goose down jacket. (Day 2 Trial Tr. at 170-71). Larry Wall, who was the disc jockey at Jethroe's night of the shooting, testified that the shooter was wearing a green down jacket. (Id. at 97). After the shooting, Wall stated, another man grabbed the shooter and said "come on, let's go" and together they ran out the exit door. (Id. at 100-02).

David Morris, who hurried to Jethroe's parking lot when the shooting started, testified that he saw the shooter and another man come out of Jethroe's and run from the scene. (Day 3 Trial Tr. at 41-42). Morris said that the man who was with the shooter was saying to the shooter "come on." Morris saw the gun the shooter was holding and said it looked like the weapon introduced as Exhibit 17. (Id.) Although he did not get a good look at the faces of the shooter and his accomplice, Morris did say that the shooter was wearing a green puffy coat. (Id. at 40-45).

Kelly Williams saw the shooter holding the gun and firing it. (Day 2 Trial Tr. at 111-15). She said he was wearing a down coat, which she thought was the color black. (Id.) Williams said the shooter was "with one other guy" (id. at 116) and that they exited Jethroe's door going towards the parking lot. (Id. at 116-17, 127-28).

Taken together, the testimony of these witnesses (Lattanzie, Skurka, Gambel, Overton, McLaurin, Wall, Morris, and Williams) tended to prove that Mathis and the shooter were with each other inside Jethroe's and fled the scene together on foot. Their testimony was consistent with Mathis's videotaped statement, and that statement and their testimony was evidence that, if credited, proved that Petitioner was the shooter.

Additional important evidence to corroborate Mathis's videotaped statement was given by Michael Clutter, Deshawn Beard (also known as Deshawn Lyons) and Pam Barnes. In his videotaped statement, Mathis said that after he and Petitioner fled the scene of the shooting, he and Petitioner stopped briefly at a nearby bar and then took a cab from that bar to the Franklin Terrace housing project where Felicia Clark lived. He also said that they ended up at another home with two women, one of whose name was "Pam." However, at trial Mathis testified that he drove himself to a place he referred to as the Holly. Michael Clutter is a cab driver. After reviewing his trip sheets for December 10, 1994, he testified that at 1:48 a.m. he picked up two black males from Red's Tavern, which is not far from Jethroe's, and drove them to the Franklin Terrace housing project. (Day 3 Trial Tr. at 190-92). The Commonwealth contended that the two men Clutter picked up were Petitioner and Mathis. (Day 5 Trial Tr. at 77-79).

Deshawn Beard lived in Franklin Terrace and was Felicia Clark's neighbor. She testified that she and her friend Pam Barnes were together at her home after the shooting at Jethroe's and that "[t]wo boys from out of town" came to her house. (Day 3 Trial Tr. at 139-40). Beard acknowledged that when investigators showed her a photographic line-up, she selected Petitioner's picture when asked to identify who came to her home after the shooting. (Id. at 141-42). Although she claimed that she did not know either man's name, she said that she thought that at the time the men were staying with Felicia Clark. (Id. at 142, 164). Detective Joseph Spusta testified later in the trial that when he interviewed Beard during

the course of the investigation, she told him that Mathis was the other man who came to her house after the shooting. Det. Spusta also testified that Beard selected Mathis's picture out of a photographic line-up. (Day 4 Trial Tr. at 8-9).

Pam Barnes confirmed that she was at Deshawn Beard's house during the relevant time period. She testified that Mathis came to Beard's house after the shooting. (Day 3 Trial Tr. at 149). During Barnes's direct examination, Hayes showed her the photographic line-up that contained Petitioner's picture. Barnes selected Petitioner's photograph and stated that he came to Beard's home with Mathis that morning. (Id. at 151).

Taken together, Clutter's, Beard's and Barnes's testimony provided further evidence to corroborate Mathis's videotaped statement and their testimony was additional evidence that tended to prove that Petitioner was the shooter.

### The Commonwealth's Case – Witnesses Identifying Petitioner as the Shooter

The Commonwealth also introduced the testimony of three witnesses who said they saw the shooting and identified Petitioner as the shooter. Roseanna Wayne testified that she was approximately ten feet from the shooting. (Day 2 Trial Tr. at 51-54). Similar to several other witnesses, she said that the shooter was a darker-skinned black male, wore a green goose down coat, and ran out the back door after the shooting. (Id. at 55-58). Wayne identified Exhibit 17 as the gun that that she saw the shooter using. (Id. at 56-57). When Hayes asked her if she would recognize the shooter if she saw him again, she replied: "No. I don't know…. No. I'm not sure." (Id. at 58). In response to Hayes's question of whether the shooter was in the courtroom, Wayne nodded her head but noted that at the time of the shooting the shooter had a shorter haircut and did not have facial hair. (Id.; see also id. at 65-66). She also testified

that Petitioner "look like the shooter" (Id.) Wayne then made an in-court identification of Petitioner as the person she saw shooting the gun at Jethroe's on December 10, 1994. (Id. at 58-59).

Dorothea Roberts testified that she was about 15 feet from the shooting. (Id. at 177-78). She said the shooter was wearing a thick jacket that she recalled being the color blue. (Id. at 179-80). Roberts testified that Petitioner was the shooter and made an in-court identification of him. (Id. at 184, 195-96). During her cross-examination, Moore asked Roberts if she remembered telling the police when she was interviewed by them that she did not see the man who was shooting the gun. (Id. at 187-88). Roberts stated that if Det. Skindell wrote that in a report that "he's telling a lie." (Id. at 188). Det. Skindell testified later in the trial that when he interviewed Roberts, she did tell him that she did not see the shooter. (Day 4 Trial Tr. at 89).

Antoinette Blue testified that she met Petitioner about two weeks before the shooting at Felicia Clark's house. (Day 2 Trial Tr. at 207-08). She stated that she saw the shooting and identified Petitioner as the shooter. (Id. at 207). She also said that about twenty minutes prior to the shooting, she and her friend Tammy smoked marijuana with Petitioner, Tony Clark, Mathis, and a woman named Yolanda in Jethroe's parking lot. (Id. at 203-04). During her cross-examination, Blue admitted that although she saw the police at Jethroe's right after the shooting, she did not report that she could identify the shooter until more than three years later, in February 1998. At the time she made her report, she was in the Erie County Jail on charges that she violated her probation[6] (her original conviction was for disorderly conduct). (Id. at 225-27). In response to Moore's suggestion that she came forward with information only in order to get assistance to get out of jail, Blue said that she did not report what she knew earlier because she was afraid, and that she contacted police only after she learned in the news that Petitioner

---

[6]      Although Blue consistently referred to her probation violation, according to Petitioner it was actually a parole violation.

had been arrested. (Id. at 226-27). Blue admitted that she previously had pled guilty to a theft charge but said she "did [her] time for that." (Id. at 226).

### The Commonwealth's Case – Witnesses Identifying the Coat of the Shooter

In addition to the witnesses already discussed, the Commonwealth called numerous other witness who were at Jethroe's at the time of the shooting and who testified that the shooter was wearing a large down coat, which most described as being the color green. (Day 2 Trial Tr. at 83 (David Tate), 135 (Ebony Ponder), 152-53 (Veronica Hughes), 161 (Gladys McLaurin)). The Commonwealth also presented evidence to demonstrate that Exhibit 17 was Petitioner's gun, and that he wore a green down coat. Nicole Thomas lived near Felicia Clark and often visited her. (Day 3 Trial Tr. at 153-54). Thomas testified that she saw and spoke with Petitioner at Felicia Clark's house approximately four days before the shooting and that one of the times she saw him he was carrying a gun that looked like Exhibit 17. (Id. at 154-57). Thomas also testified that she once saw Petitioner in Felicia Clark's driveway and that he was wearing a green down coat. (Id. at 160). Kenneth Henderson testified that he would run errands for Tony Clark in exchange for drugs. (Day 4 Trial Tr. at 20). He stated that on several occasions he saw Petitioner carrying the gun that had been introduced as Exhibit 17. (Id. at 22-23).

On October 1, 1998, the jury found Petitioner guilty of first-degree murder, possessing instruments of crime, aggravated assault and reckless endangerment. The court sentenced him to a term of life imprisonment for murder plus a period of incarceration of 15-30 months consecutive to his life sentence.

### Post-Trial Challenges

In his direct appeal, Petitioner was represented by Joseph P. Burt, Esq. On August 23, 1999, the Superior Court of Pennsylvania issued a Memorandum in which it affirmed Petitioner's judgment of

sentence. (ECF No. 41-24, <u>Commonwealth v. Haskell</u>, No. 2205 Pittsburgh 1999, slip op. (Pa.Super.Ct. Aug. 23, 1999) ("<u>Haskell 1</u>")).

Petitioner, who had been in the custody of the State of New York since sometime before August 1999 (<u>see</u> ECF No. 33), was transferred to the Pennsylvania Department of Corrections in 2007. In June 2008, he sought collateral relief from his convictions pursuant to Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa.Cons.Stat. § 9541 *et seq*. After both his first and second PCRA motions were dismissed as untimely, he filed with this Court a *pro se* Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. (ECF No. 4).

Respondents filed a motion to dismiss (ECF No. 13) in which they contended that the petition was untimely under the applicable statute of limitations at 28 U.S.C. § 2244(d). The Court appointed counsel to represent Petitioner and held an evidentiary hearing on the issue of timeliness. On October 3, 2011, this Court issued an Opinion and Order in which it denied the motion to dismiss. (ECF No. 33). This Court held that Petitioner met his burden of demonstrating that he was entitled to statutory and equitable tolling due to, *inter alia*, numerous administrative errors made by the state courts that interfered with his ability to pursue PCRA relief.

On May 4, 2012, Petitioner's counsel filed the Amended Petition (ECF No. 41) which is the petition now before the Court. In it, Petitioner raises the following five claims (four of which are specifically regarding Antoinette Blue's testimony):

| Claim A | The Commonwealth violated Petitioner's due process rights because it knowingly presented false testimony from Antoinette Blue |
| Claim B | The Commonwealth violated Petitioner's due process rights by committing a <u>Brady</u> violation because it suppressed evidence related to criminal charges pending against Antoinette Blue in Mercer County, Pennsylvania |

| Claim C | Direct appeal counsel was ineffective for failing to file a petition for allowance of appeal with the Supreme Court of Pennsylvania following the Superior Court's 1999 decision affirming his judgment of sentence |
| --- | --- |
| Claim D | The photographic line-up shown to Antoinette Blue was suggestive and, as a result, her in-court identification of Petitioner violated his due process rights |
| Claim E | Trial counsel was ineffective for failing to: (i) renew the motion to suppress following Antoinette Blue's trial testimony; and (ii) adequately cross-examine Blue to reveal the inconsistencies between her testimony and the testimony of other witnesses, and to impeach her with inconsistent statements that she made at the preliminary hearing |

(ECF No. 41 at 14-32).

After filing the Amended Petition, Petitioner filed a motion to stay this case. (ECF No. 42). He explained that he had recently filed a third PCRA motion with the Court of Common Pleas of Erie County in order to exhaust his state court remedies with respect to the due process claims set forth in the Amended Petition as Claims A and B. The Court granted Petitioner's motion and stayed this case during the pendency of the state proceeding.

The Court of Common Pleas denied Petitioner's third PCRA motion without a hearing. (SCR 2 at No. 2). On August 7, 2013, the Superior Court issued a Memorandum in which it affirmed that decision. It held that the third PCRA motion was untimely under the PCRA's statute of limitations. In so holding, it concluded that Petitioner failed to establish that the information he relied upon to support Claims A and B could not have been obtained earlier by the exercise of due diligence. (SCR 2 at No. 11, Commonwealth v. Haskell, No. 809 WDA 2012, slip op. at 11-13 (Pa.Super.Ct. Aug. 7, 2013) ("Haskell 2")).

Thereafter, Petitioner filed a motion to lift the stay in this case, which was granted. Respondents then filed their Answer (ECF No. 49) and Petitioner filed a Reply (ECF Nos. 51 & 53).

**B.**     **Standard of Review**

The Amended Petition is governed by the federal habeas statute applicable to state prisoners, 28 U.S.C. § 2254. Under this statute, "[t]he Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Errors of state law are not cognizable. Id. See, e.g., Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). Petitioner carries the burden of proving he is entitled to the writ. See, e.g., Cullen v. Pinholster, — U.S. — , 131 S.Ct. 1388, 1398 (2011).

In describing the role of federal habeas proceedings, the United States Supreme Court noted:

> [I]t must be remembered that direct appeal is the primary avenue for review of a conviction or sentence.... The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited. Federal courts are not forums in which to relitigate state trials.

Barefoot v. Estelle, 463 U.S. 880, 887 (1983). Habeas corpus is a "'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Harrington v. Richter, 562 U.S. 86, 102-03 (2011) (quoting Jackson v. Virginia, 443 U.S. 307, 332, n.5 (1979) (Stevens, J., concurring in judgment)).

In 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which amended § 2254. AEDPA imposes "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." Pinholster, 131 S.Ct. at 1398 (internal quotation marks and citations omitted). That standard of review is codified at 28 U.S.C. § 2254(d) and it provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted *with respect to any claim that was adjudicated on the merits in State court proceedings* unless the adjudication of the claim–

(1) resulted in a decision that was contrary to, or involved an unreasonable
application of, clearly established Federal law, as determined by the Supreme
Court of the United States, or

(2) resulted in a decision that was based on an unreasonable determination of the facts in
light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (emphasis added). Thus, AEDPA circumscribes a federal habeas court's review of a state prisoner's constitutional claim when the state court adjudicated that claim on the merits and denied it. For the purposes of § 2254(d), a claim has been "adjudicated on the merits in State court proceedings" when that state court has made a decision that finally resolves the claim based on its substance, not on a procedural, or other, ground. See, e.g., Richter, 562 U.S. at 99-100; Robinson v. Beard, 762 F.3d 316, 324 (3d Cir. 2014).

In the event that the federal habeas court is reviewing the merits of a claim that the state court did not "adjudicate[ ] on the merits," AEDPA's standard of review at § 2254(d) does not apply and the federal habeas court's review is *de novo*. See, e.g., Cone v. Bell, 556 U.S. 449, 472 (2009); Thomas v. Horn, 570 F.3d 105, 124 (3d Cir. 2009). In any case, regardless of whether § 2254(d)'s standard of review applies, the state court's factual determinations are presumed to be correct unless the petitioner rebuts that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## C. **Discussion**

### 1. **Claims A and B – The False Evidence and <u>Brady</u> Claims**

#### (a) **Background**

In early February 1998, Antoinette Blue was charged in Mercer County, Pennsylvania, with receiving stolen property, criminal conspiracy, three counts of retail theft as misdemeanor ones, four counts of retail theft as summary offenses, and unsworn falsification. (ECF No. 41-4, Pet's Ex. D). At

that time, two arrest warrants from Erie County were lodged as detainers against her.[7] (ECF No. 41-5,

Pet's Ex. E). On February 19, 1998, Blue posted bond in the Mercer County case. (ECF No. 41-6,

Pet's Ex. F). She was then taken to the Erie County Prison based on the two outstanding arrest warrants.

Around this time, she contacted Erie County authorities and told them that she had information

regarding the criminal case pending against Petitioner. Blue's initial contact with detectives in this case

occurred between the date on which Petitioner was arrested and charged (in November of 1997) and his

trial (in September of 1998). Det. Skindell interviewed her on March 3, 1998.

Both Det. Skindell and the prosecutor in Petitioner's criminal trial, Hayes, subsequently informed

Mercer County authorities that Blue was a cooperating witness in its case against Petitioner. (ECF

No. 41-11, Pet's Ex. K; ECF No. 41-12, Pet's Ex. L; ECF No. 49-1, Resp's Ex. 1). The Mercer County

prosecutor told Hayes that a plea agreement already was in place in Blue's criminal case in that county

and that he would not alter his approach to his prosecution of her. However, that prosecutor did inform

Hayes that the Mercer County judge who would sentence Blue would be made aware of her cooperation.

(See ECF No. 49-1, Resp's Ex. 1).

During his cross-examination of her, Moore asked Blue if she was still in jail. She replied that

she was not and that she had been released on probation to a drug rehabilitation program. (Day 2 Trial

Tr. at 229-31). Moore made the point that Blue was released to probation after she testified at the

preliminary hearing in Petitioner's case, but Blue denied that the Erie County judge knew that she was

cooperating with the prosecution in Petitioner's case. (Id. at 230). Moore did not ask Blue any questions

---

[7]      One of the arrest warrants was based on Blue violating her parole in case number 733 of 1996 where she had been
convicted of disorderly conduct and resisting arrest. She was sentenced to 1-11 months custody on the disorderly conduct
count to be followed by two years of probation on the resisting arrest count. (ECF No. 41-1, Pet's Ex. A). Blue was paroled
after serving one month. (ECF No. 41-2, Pet's Ex. B). The second arrest warrant had been issued in case number 1514 of
1996. In that case, Blue had pled guilty to criminal attempt to commit theft by unlawful taking. She was to be sentenced for
that offense on February 18, 1997, but failed to appear. A bench warrant was then issued for her arrest. (ECF No. 41-3,
Pet's Ex. C).

about her Mercer County criminal case and the jury did not learn that the Mercer County judge who would sentence her in that case would be made aware that she testified as a prosecution witness in Petitioner's criminal trial.

In his redirect examination, Hayes addressed Moore's attempts to establish that Blue had agreed to cooperate in the hopes of receiving some benefit from the Commonwealth:

> Q.    Follow-up by Mr. Moore: Have you been promised anything by us to come in here and explain what you just explained?
>
> A.    No.
>
> Q.    Do you anticipate receiving any consideration for it?
>
> A.    Do I what?
>
> Q.    Do you expect to get something out of testifying?
>
> A.    No, sir.
>
> Mr. Hayes:    All right. That's all I have.

(Id. at 231).

A little over a month after testifying at Petitioner's trial, Blue pleaded guilty in the Mercer County Court of Common Pleas to one count each of retail theft and unsworn falsification. The Mercer County District Attorney's Office agreed to recommend a probationary sentence. (ECF No. 41-13, Pet's Ex. M). In December 1998, Hayes sent a letter to the Court of Common Pleas of Mercer County in which he explained that Blue gave "very important" testimony at Petitioner's trial. Hayes also wrote that "I made Ms. Blue aware of the fact that I could not and would not alter the outcome of her charges in Mercer County. She understood this and has not asked for assistance in that regard, except that I write this letter." (ECF No. 41-11, Pet's Ex. K).

On December 9, 1998, Blue was sentenced in the Court of Common Pleas of Mercer County to one to four years of imprisonment on the retail theft count with the sentence suspended and she was

"placed on probation for a period of 18 months, consecutive to her existing sentences[.]" The court sentenced her to pay costs on the unsworn falsification count. (ECF No. 41-15, Pet's Ex. O).

### (b)    Petitioner contends that the prosecution did not disclose information related to Blue's Mercer County charges

Several months before Petitioner's trial, towards the end of April 1998, defense counsel Moore filed Petitioner's omnibus pre-trial motion, which included a motion to suppress identification testimony and a motion for discovery in which he sought the production of numerous items. (SCR 1 at No. 13). One category of documents requested was "[a] copy of the prior criminal record of Antoinette Blue including all arrests in the Commonwealth of Pennsylvania and in the State of Illinois and including the disposition of all criminal charges filed against Antoinette Blue." (Id., ¶ 3.O). Moore also requested "[a] written statement setting forth any consideration, assistance or favorable recommendation that any agent of the Commonwealth … provided to any witness that the Commonwealth intends to call at trial in exchange for the said witness providing testimony for the Commonwealth." (Id., ¶ 3.P). The trial court ordered the Commonwealth to provide to the defense its response to the motion for discovery within ten days, and it scheduled a hearing concerning all remaining omnibus pre-trial matters for May 27, 1998. (SCR 1 at No. 14).

Petitioner asserts in the Amended Petition that "[t]he fact of the pending Mercer County charge was obviously not included in the Commonwealth's response to the motion [for discovery]" (ECF No. 41 at 17), and that the prosecution did not disclose that Det. Skindell and prosecutor Hayes had contacted Mercer County authorities on Blue's behalf. In Claim B, Petitioner contends that, as a result, the prosecution violated its obligations under Brady v. Maryland, 373 U.S. 83 (1963). In Claim A, he contends that Blue's testimony that she was not receiving, or expecting to receive, any consideration in exchange for her testimony was false and that by introducing it the Commonwealth violated his due

20

process rights as set forth in <u>Napue v. Illinois</u>, 360 U.S. 264 (1959), <u>Giglio v. United States</u>, 405 U.S. 150 (1972) and their progeny.

These are the two claims that Petitioner raised in his third PCRA motion. (SCR 2 at No. 1). As set forth above, the Superior Court denied them as untimely under the PCRA's statute of limitations. (SCR 2 at No. 11, <u>Haskell 2</u>, No. 809 WDA 2012, slip op. at 11-13). Although the Superior Court's decision provided Respondents in this case with a potentially viable procedural default defense to Claims A and B, Respondents expressly and erroneously state in their Answer that these claims are not procedurally defaulted and that this Court must review them on the merits. Because the Superior Court did not adjudicate them on the merits, AEDPA's standard of review at § 2254(d) does not apply and this Court's review is *de novo*.

### (c)     The <u>Brady</u> Claim

The Court will first discuss Claim B. Petitioner claims that the Commonwealth violated his due process rights by committing a <u>Brady</u> violation because it suppressed evidence related to criminal charges pending against Antoinette Blue in Mercer County, Pennsylvania.

In <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), the Supreme Court held that the suppression by the prosecution of evidence favorable to an accused violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. <u>Id.</u> at 87. "Impeachment evidence, ... as well as exculpatory evidence, falls within the <u>Brady</u> rule." <u>United States v. Bagley</u>, 473 U.S. 667, 676 (1985). To prevail on his <u>Brady</u> claim, Petitioner has the burden of demonstrating: 1) favorable evidence was suppressed by the prosecution; and 2) the suppressed evidence was material. <u>See</u> <u>e.g.</u>, <u>Slutzker v. Johnson</u>, 393 F.3d 373, 386 (3d Cir. 2004); <u>see</u> <u>also</u> <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999).

Respondents contend that Petitioner cannot establish that the Commonwealth suppressed the impeachment evidence related to Blue's Mercer County case. In support, they rely upon a letter dated April 30, 1998, from prosecutor Hayes to defense counsel, Moore, which details all relevant information about Blue's Mercer County criminal case and what Hayes and Det. Skindell had done for her regarding that case. Hayes attached to that letter a copy of Blue's complete prior criminal record report, which had been run that same date and included the most current information regarding the charges Blue faced in Mercer County. (ECF No. 49-1, Resp's Exs. 1 & 2). The order of information contained in Hayes's letter follows the order of the requests made in the motion for discovery and it appears to be the Commonwealth's response to that motion. In it, Hayes wrote:

Dear Mr. Moore:

In response to your Motion for Discovery, you have my entire file. All statements that I am aware of are in your possession. I have enclosed a copy of Defendant['s] prior criminal record in case that had not been forwarded to you. I have already forwarded Defendant's Family Court record. If you do not have that, let me know and I will get it to you. All efforts at identification have been recorded in the materials already sent to you. However, I am more than happy to schedule a meeting with you and Detective Skindell to make sure we have provided you with all such information.

There are no scientific tests, expert opinions or polygraph examination results regarding your client.

We can make arrangements with Detective Skindell to view all physical exhibits in evidence.

No electronic surveillance was conducted.

As to names and addresses of eyewitnesses, I have already provided my entire file with that information. We will object to a request to have typed transcripts of any statements not already provided to you by this office.

You have all the information I have regarding Curtis Matthis.

All search warrant information is presently in your possession.

You have copies of all video taped statements that I am aware of.

*As to Antoinette Blue, I will check with Detective Skindell to make sure I have all information regarding any statements made. I have enclosed Antoinette Blue's prior record. Also, I am aware that Ms. Blue faces a misdemeanor retail theft charge in Mercer County. I spoke with the prosecutor in that case and he explained he had already arrived at a Plea Agreement in her case. That plea arrangement was reached prior to his knowledge of Ms. Blue's involvement in the present homicide. I also explained that Ms. Blue was assisting in this prosecution. He indicated to me that this assistance would*

22

*not alter his approach to his prosecution. He indicated he would make the assistance known at the time of her sentencing in Mercer County.*

As to Curtis Matthis' cooperation, I have provided another copy of my letter to Mr. Bushey at the Board of Probation and Parole. This sets forth our position.

*Finally, Detective Skindell spoke with the prosecutor in Mercer County regarding Antoinette Blue. Essentially, the prosecutor told me that Detective Skindell relayed the same information as I had, and the prosecutor's response was the same. The only understanding I am aware of is for Ms. Blue's cooperation. We would make the sentencing Judge aware of this cooperation.*

I believe this address all of your concerns in the Motion for Discovery. If not, please let me know and I will do my best to comply. Also, if you have any questions, please let me know.

(ECF No. 49-1, Resp's Ex. 1 (emphasis added)).

Petitioner admits that if this letter was sent to Moore, his <u>Brady</u> claim has no merit. (ECF No. 51, Reply at 10). Petitioner will not concede that the letter was sent to Moore, however. He will not do so because after his trial concluded in 1998, Moore delivered his file relating to Petitioner's case to direct appeal counsel (Burt), and the letter was not contained in Burt's file when it was reviewed by federal habeas counsel in February 2013. Because the state court did not hold an evidentiary hearing when Petitioner raised this <u>Brady</u> claim in his third PCRA motion, Petitioner contends that this Court does not have an adequate record before it to determine whether the letter actually was sent to Moore and he requests that this Court hold one. (ECF No. 51, Reply at 9-10).

### (1)     No evidentiary hearing is required

Under AEDPA as codified at 28 U.S.C. § 2254(e)(2), "a habeas court is barred from holding an evidentiary hearing unless the petitioner was diligent in his attempt to develop a factual basis for his claim in the state court proceedings[.]" <u>Palmer v. Hendricks</u>, 592 F.3d 386, 392 (3d Cir. 2010) (citing <u>Williams v. Taylor</u>, 529 U.S. 420, 430 (2000) and <u>Wilson v. Beard</u>, 426 F.3d 653, 665 (3d Cir. 2005)). The Court will assume without deciding that § 2254(e)(2)'s limitation does not apply here because Petitioner requested an evidentiary hearing in his third PCRA motion and the state court denied that

23

request. Another limitation to a federal habeas court's ability to hold an evidentiary hearing comes into play when the claim at issue was adjudicated on the merits by the state court and, therefore, AEDPA's standard of review under § 2254(d) applies. In Cullen v. Pinholster, the Supreme Court held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." 131 S.Ct. at 1398. Pinholster's limitation does not apply here because this Court is not reviewing this claim under § 2254(d)'s standard of review.

In cases where the petitioner is not barred from obtaining an evidentiary hearing by § 2254(e)(2) or Pinholster, the decision to grant a hearing rests in the discretion of the district court. Palmer, 592 F.3d at 393. See also Lee v. Glunt, 667 F.3d 397, 406 (3d Cir. 2012). In deciding whether to exercise that discretion, the district court "must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." Palmer, 592 F.3d at 393 (quoting Schriro v. Landrigan, 550 U.S. 465, 474 (2007)). Importantly, "bald assertions and conclusory allegations do not afford a sufficient ground for an evidentiary hearing." Campbell v. Burris, 515 F.3d 172, 184 (3d Cir. 2008) (quoting Mayberry v. Petsock, 821 F.2d 179, 185 (3d Cir. 1987)). The Court of Appeals for the Third Circuit also has instructed that:

> "if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." Schriro, 550 U.S. at 474, 127 S.Ct. 1933. That is, even if the factual allegations in the habeas petition are sufficient to make out a *prima facie* claim for habeas relief, a district court may decline to convene an evidentiary hearing if the factual allegations are "contravened by the existing record." Id. (citation omitted); see also Campbell, 209 F.3d at 290.

Palmer, 592 F.3d at 393.

After evaluating Petitioner's request for an evidentiary hearing with these considerations in mind, the Court is not persuaded by Petitioner's argument that a hearing is required. When Petitioner raised his Brady claim in his third PCRA motion and he requested an evidentiary hearing there, Petitioner

contended that Attorney Moore would testify "that he was not told that Blue received assistance" from Erie County authorities in her Mercer County case "and that he was not informed about the charges pending against Blue in Mercer County." (SCR 2 at No. 1, ¶ 12A.4). This Court can determine on the record already before it that at least the latter proffer is not true. In his <u>Petition for the Final Payment of Attorney's Fees and Expenses</u>, which Attorney Moore filed soon after Petitioner's trial, he provided an itemized statement for services he rendered. His entry for work performed on July 16, 1998, lists that on that date he: "Review[ed] Material re: Antoinette Blue, recorded statements, prior record, criminal complaints, records of incarceration in Erie *and Mercer Counties*." (SCR 1 at No. 35B, at 4 (emphasis added)). Based upon this document, there can be no dispute that Moore possessed Blue's Mercer County criminal records prior to Petitioner's trial, and Petitioner's allegation that Moore was not informed about Blue's Mercer County charges can be rejected without an evidentiary hearing.

The fact that Attorney Moore had Blue's Mercer County criminal records at that time cuts against Petitioner's contention that there is incomplete evidence of record from which this Court can determine whether the April 30, 1998, letter was sent to Moore. Hayes attached Blue's criminal records to the letter. Since Moore had Blue's criminal records (as evidenced by his invoice dated July 16, 1998 for services rendered), it is reasonable to conclude that he received them via Hayes's April 30, 1998, letter. Additional support for the conclusion that the letter was sent to Moore is available from a review of the transcript from the hearing on the omnibus pre-trial motion held on May 27, 1998. The Commonwealth's response to the motion for discovery that Moore filed was due at the beginning of that month. Hayes's April 30, 1998, letter appears to be the Commonwealth's response. If Moore did not receive it, that fact would have been raised in a motion filed by the defense and/or discussed at the hearing. It was not. Neither Moore nor Hayes stated anything that would indicate that Moore did not receive Hayes's April 30, 1998, letter response to the motion for discovery. That motion was discussed at the beginning of the

25

May 27, 1998, hearing, and the only issue that Moore raised was one regarding his request that the videotaped statements be transcribed and that he receive a copy of the transcription. (5/27/98 Hr'g Tr. at 5-8). Moore's comments on this point also support a finding that Moore received Hayes's letter, because in the letter Hayes stated that he objected to Moore's request to provide typed transcripts of videotaped statements. (ECF No. 49-1, Resp's Ex. 1 at 1). Hayes also pointed out at that hearing that he still had to get to Moore a written report from the fingerprint expert. (Id. at 10). In addition, Hayes commented at the hearing that "with regards to the first portion of the [omnibus pre-trial motion, which was the motion for discovery] of Mr. Moore, I believe we responded to everything." (Id. at 9). Moore did not challenge that statement. Hayes then commented that due to the large volume of discovery, he proposed that he and Moore meet to "make sure he has everything that I have." (Id.)

Based upon the foregoing, it appears that most, if not all, of Petitioner's factual allegations are contravened by the existing record. Moreover, Petitioner has not convinced the Court that any additional relevant and credible information could be added to the record at an evidentiary hearing.[8] For these two reasons, the Court could deny Petitioner's request for a hearing. However, the Court denies his request for one because it does not need to resolve the issue of whether Hayes sent to Moore the April 30, 1998, letter in order to dispose of his Brady claim. That is because even if the Court assumes without deciding that Hayes did not send the letter (and that Moore was not otherwise notified of Det. Skindell's and Hayes's efforts on Blue's behalf with respect to her Mercer County case), Petitioner has not satisfied Brady's materiality prong.[9]

---

[8] In light of the above discussion, it does not appear to the Court that Moore currently has an accurate recollection of the relevant events. That is understandable, as Petitioner's trial occurred more than a decade and a half ago.

[9] In his Reply (ECF Nos. 51 & 53), Petitioner alleges for the first time that if Moore knew of the Commonwealth's promises to Blue to make her cooperation known to the sentencing judge in Mercer County, Moore was ineffective for failing to impeach Blue with that information. That ineffective assistance of counsel claim is not a claim that Petitioner raised in the *Continued on next page…*

### (2)     Petitioner has not met his burden of establishing materiality

In a <u>Brady</u> claim, evidence is material if there is a reasonable probability that the outcome of the

trial would have been different had the evidence been disclosed to the defense. <u>See</u>, <u>e.g.</u>, <u>Bagley</u>, 473

U.S. at 678. The Supreme Court explained:

> Although the constitutional duty is triggered by the potential impact of favorable but undisclosed evidence, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant). <u>Bagley</u>'s touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial." <u>Bagley</u>, 473 U.S. at 678[.]
>
>      . . . A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a <u>Brady</u> violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

<u>Kyles v. Whitley</u>, 514 U.S. 419, 434-35 (1995) (additional internal citations omitted).

---

Amended Petition and, therefore, is not before the Court and the Court cannot consider it. A petitioner cannot raise new claims in a reply. <u>See</u> Rule 2 of the Rules Governing Section 2254 Cases In the United States District Courts ("The petition must: (1) Specify <u>all</u> the grounds for relief available to the petitioner; (2) state the facts supporting each ground[.]"); Local Rule 2254.B.2.b (same). <u>See</u> also <u>Cacoperdo v. Demosthenes</u>, 37 F.3d 504, 507 (9th Cir. 1994) ("A Traverse is not the proper pleading to raise additional grounds for relief."). To the extent that Petitioner argues that this claim should be considered as part of Claim E(ii) of the Amended Petition, that argument is rejected. In Claim E(ii), Petitioner contends that Moore was ineffective because he failed to impeach Blue with inconsistent statements that she made at the preliminary hearing and also to reveal inconsistencies between her testimony and that of the other witnesses in Jethroe's at the time of the shooting. A claim that Moore was ineffective for failing to impeach Blue with evidence that the Mercer County judge who was going to sentence her would be made aware that she was a cooperating witness in Petitioner's case is a different claim than Claim E(ii). That being said, even if this Court did consider this new claim on the merits, it would be denied because, for the reasons discussed below, Petitioner cannot demonstrate that Moore's alleged ineffectiveness for failing to utilize evidence of Blue's Mercer County criminal case in order to impeach her testimony prejudiced him.

Petitioner has not met his burden of demonstrating that there is a reasonable probability that the outcome of his trial would have been different had the information at issue been disclosed to the defense. It is true, as he contends, that Antoinette Blue was an important witness at his trial. There were many important witnesses, however. The Commonwealth called forty witnesses in its case in chief. In addition to Blue, Roseanna Wayne and Dorothea Roberts identified Petitioner as the shooter.[10] Mathis's videotaped statement, which was played for the jury and introduced as substantive evidence to prove the truth of the matters asserted therein, also established if credited that Petitioner was the shooter. Numerous witnesses corroborated details Mathis gave in his videotaped statement, thus bolstering the credibility of that statement. The Commonwealth also introduced testimony from numerous witnesses to support a finding that the shooter was wearing a down jacket similar to the one that Nicole Thomas had seen Petitioner wear prior to the shooting, that Petitioner's gun was the murder weapon, and that he fled from the scene with Mathis after the shooting and then left Erie very soon after the shooting. In conclusion, even considering the allegedly improperly withheld impeachment evidence regarding Blue, the Court's confidence in the outcome of his trial is not undermined. Therefore, Claim B is denied.

### (d)    False evidence claim

Next, at Claim A, Petitioner claims that the Commonwealth violated his due process rights because it knowingly presented false testimony from Blue.

In both <u>Napue</u> and <u>Giglio</u>, the prosecution made agreements with witnesses in exchange for their testimony. Both witnesses falsely denied the existence of the agreements, and the prosecutors failed to

---

[10]    The jury may have questioned the credibility of Roberts's identification because Det. Skindell testified that she told him that she did not see the shooter. However, Hayes's argument to the jury that some individuals had been afraid to cooperate with the police may have swayed the jury to credit her testimony. In any event, Wayne's testimony was not as problematic as Roberts's. Wayne testified that Petitioner looked like the shooter and made an in-court identification of him.

correct their testimony. In <u>Napue</u>, the Supreme Court held that a conviction is obtained through the use of false evidence, and therefore violates the Fourteenth Amendment, when the state, "although not soliciting false evidence, allows it to go uncorrected when it appears." 360 U.S. at 269. In <u>Giglio</u>, the government's case depended almost entirely on the testimony of a witness whom the government promised it would not prosecute if he testified. The trial prosecutor had not himself made the agreement and was unaware of it, but the Court charged him with knowledge of the agreement made by his predecessor. The Court held that because the evidence was relevant to the jury's assessment of the credibility of the witness, a new trial would be "required if 'the false testimony could ... in any reasonable likelihood have affected the judgment of the jury[.]'" <u>Giglio</u>, 405 U.S. at 154 (quoting <u>Napue</u>, 360 U.S. at 271).

Petitioner argues that Antoinette Blue committed perjury during her cross-examination by Moore. Respondents counter that Attorney Moore only asked Blue about her Erie County criminal cases and, therefore, she did not state anything in response to Moore's questions that was inaccurate. Even if the Court was persuaded by Respondents' argument on this point, the Court agrees with Petitioner that Blue's responses to Hayes during his redirect examination were not accurate. Blue did get consideration for testifying against Petitioner: the Mercer County judge that was going to sentence her was to be notified that she was an important witness in a recent Erie County murder trial. Therefore, the Court accepts Petitioner's contention that Blue's testimony during her redirect examination was false and that Hayes knew or should have known it was false.

With that point settled, Petitioner contends that he is entitled to relief on this claim if "there is any reasonable likelihood that [Blue's] false testimony could have affected the verdict." (ECF No. 41, Amended Petition, at 18 (quoting, *inter alia*, <u>United States v. Kelly</u>, 35 F.3d 929, 933 (4th Cir. 1994), which quoted <u>United States v. Argurs</u>, 427 U.S. 97, 103 (1976) (which cited the "reasonable likelihood"

standard from <u>Napue</u> and <u>Giglio</u>)). That is not correct. In a federal habeas proceeding, a claim of this type is reviewed differently than it would be on direct appeal. In federal habeas, the court must assess the *actual prejudicial* impact of a constitutional error in a state criminal trial under the harmless error standard articulated in <u>Brecht v. Abrahamson</u>, 507 U.S. 619 (1993). <u>Brecht</u> requires that in order to grant habeas relief on a trial error such as this, the federal habeas court must find that the introduction of Blue's false testimony had a "substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. at 637 (quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 776 (1946)). <u>Fry v. Pliler</u>, 551 U.S. 112 (2007). <u>See also</u> <u>United States v. Clay</u>, 720 F.3d 1021, 1025-27 (8th Cir. 2013); <u>Trepal v. Sec'y, Florida Dep't of Corr.</u>, 684 F.3d 1088, 1108-14 (11th Cir. 2012); <u>Guzman v. Sec'y Dep't of Corr.</u>, 663 F.3d 1336, 1355-56 (11th Cir. 2011); <u>Rosencrantz v. Lafler</u>, 568 F.3d 577, 588-92 (6th Cir. 2009); <u>Robinson v. Arvonio</u>, 27 F.3d 877, 884-87 (3d Cir. 1994), vacated and remanded for further consideration in light of <u>O'Neal v. McAninch</u>, 513 U.S. 432 (1995), in which the Court clarified how a federal habeas court should apply the <u>Brecht</u> harmless error standard, 513 U.S. 1186 (1995). <u>See</u> <u>also</u> <u>Davis v. Ayala</u>, — U.S. — ,135 S.Ct. 2187, 2197 (2015) ("In a collateral proceeding, the [harmless error] test is different. For reasons of finality, comity, and federalism, habeas petitioners 'are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.' [<u>Brecht</u>, 507 U.S. at 637].")[11]

Under the <u>Brecht</u> test, relief is proper only if the federal habeas court has "grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the

---

[11]     Federal habeas courts do not conduct a <u>Brecht</u> inquiry when analyzing a <u>Brady</u> claim or a claim of ineffective assistance under <u>Strickland v. Washington</u> because the materiality/prejudice standard of those claims subsumes <u>Brecht</u> and obviates a later harmless-error review under <u>Brecht</u>. <u>See</u> <u>Kyles</u>, 514 U.S. at 435; <u>See also</u> <u>Albrecht v. Horn</u>, 485 F.3d 103, 139 (3d Cir. 2007) (quoting <u>Whitney v. Horn</u>, 280 F.3d 240, 258-59 & n.18 (3d Cir. 2002) for the proposition that "<u>Strickland</u> prejudice and <u>Brecht</u> harmless error are essentially the same standard."). In contrast, since the materiality prong in a <u>Napue/Giglio</u> false evidence claim is less demanding than the <u>Brecht</u> standard, a federal habeas court must conduct a <u>Brecht</u> harmless error analysis on such claims. <u>See</u>, <u>e.g.</u>, <u>Clay</u>, 720 F.3d at 1026 n. 4 (citing <u>Rosencrantz</u>, 568 F.3d at 584 n.1, 589); <u>Trepal</u>, 684 F.3d at 1108-14.

jury's verdict[.]" <u>O'Neal v. McAninch</u>, 513 U.S. 432, 436 (1995) (quotation marks omitted); <u>Bond v. Beard</u>, 539 F.3d 256, 276 (3d Cir. 2008). For the reasons already discussed, the Court is not in grave doubt that the introduction of the testimony at issue had a "substantial and injurious effect or influence" on the jury's verdicts. Therefore, its admission was harmless under <u>Brecht</u> and relief is denied on Claim A.

### 2. Claim C – Ineffective Assistance of Counsel on Appeal

In Claim C, Petitioner contends that he is entitled to habeas relief because his direct appeal counsel, Joseph Burt, abandoned him after the Superior Court affirmed his conviction and he did not file a petition for allowance of appeal with the Supreme Court of Pennsylvania. As explained above, in relevant part, 28 U.S.C. § 2254 limits the claims that a state prisoner can raise in a federal habeas proceeding to those that assert violations of the United States Constitution. A claim of ineffectiveness of counsel is cognizable in a federal habeas proceeding only if there is a federal right to counsel at the stage when counsel is alleged to have been ineffective. <u>Coleman v. Thompson</u>, 501 U.S. 722, 752 (1991) ("There is no constitutional right to an attorney in state post-conviction proceedings. Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings.") (citations omitted). Here, at the point where Burt is alleged to have been ineffective – during the discretionary appeal to the Supreme Court of Pennsylvania – Petitioner did not have a federal constitutional right to counsel. <u>Wainwright v. Torna</u>, 455 U.S. 586 (1982) (per curiam) (citing <u>Ross v. Moffitt</u>, 417 U.S. 600 (1974) and holding that there is no federal constitutional right to counsel when applying to state supreme court for discretionary review). Therefore, Claim C is denied.

### 3. Claim D – Blue's In-Court Identification of Petitioner

#### (a) Background

Included in Petitioner's April 1998 omnibus pre-trial motion was a request that Antoinette Blue's identification of Petitioner be suppressed. In support of this argument, Petitioner pointed out, *inter alia*, that his real name ("Vance Haskell") was written on the photograph of him that the police used in the photo array and showed to several witnesses, including Blue. Although Petitioner's name was covered with tape, it still was visible. (5/28/98 Hr'g Tr. at 73-74; SCR 1 at No. 13).

Det. Skindell and Blue testified at the May 27, 1998, hearing regarding Petitioner's motion to suppress. Blue stated that she saw Petitioner two weeks prior to the shooting at Felicia Clark's house and that she also saw him again shortly before the shooting when they were in Jethroe's parking lot smoking marijuana. Blue testified that she was approximately 8-10 feet from Petitioner when the shooting occurred and that she was able to see his face as he was shooting. (Id. at 55-58).

Under the Fourteenth Amendment's due process clause, eyewitness identification evidence is unreliable and must be suppressed if suggestive identification procedures have led to "a very substantial likelihood of irreparable misidentification." Manson v. Braithwaite, 432 U.S. 98, 116 (1977); Simmons v. United States, 390 U.S. 377, 384 (1968). See, e.g., Commonwealth v. Jarecki, 609 A.2d 194, 196 (Pa.Super.Ct. 1992). Evaluation of identification evidence potentially tainted by a pre-trial identification procedure involves a two-step inquiry. First, the trial court must determine whether the identification process (here, a photographic line-up) was impermissibly suggestive. If the line-up is found to be suggestive, the court must then determine "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." Neil v. Biggers, 409 U.S. 188, 198-200 (1972); Braithwaite, 432 U.S. at 114; see also United States v. Mathis, 264 F.3d 321, 330 (3d Cir. 2001). The latter consideration is necessary because "[a] 'suggestive and unnecessary identification procedure does not violate due process so long as the identification possesses sufficient aspects of reliability,' for reliability is the 'linchpin in determining the admissibility of identification

32

testimony." United States v. Emanuele, 51 F.3d 1123, 1128 (3d Cir. 1995) (quoting Brathwaite, 432 U.S. at 106, and citing Reese v. Fulcomer, 946 F.2d 247, 258 (3d Cir. 1991) for the proposition that suggestive interaction that creates no risk of misidentification does not violate due process). See also Jarecki, 609 A.2d at 199 ("Although we conclude that the photographic identification procedure was unduly suggestive …, that fact does not necessarily undermine the reliability of a subsequent in-court identification at appellant's retrial.")

The trial court granted Petitioner's motion to the extent that it sought the suppression of Blue's *out-of-court photographic identification* of Petitioner because it occurred after his arrest and his counsel was not present. (ECF No. 41-43, Opinion and Order at 3. See also ECF No. 41-20, 1925(a) Opinion at 5). The court went on to decide that Blue would be allowed to make an *in-court identification* of Petitioner because it would be reliable enough to pass the threshold for admissibility. The court explained:

> Turning to Ms. Blue's in-court identification, the Court notes the following. Despite a suggestive identification procedure, an in-court identification will not be suppressed if the Commonwealth has shown by clear and convincing evidence that there exists an independent basis for the in-court identification. See, generally, Commonwealth v. Spencer, 639 A.2d 820, 825 (Pa.Super. 1994). See also, Neil v. Biggers, 409 U.S. 188, 197-198 (1972). Factors to be considered are: (1) the circumstances under which the witness viewed the actual crime; (2) the witness['s] degree of attention; (3) the accuracy of the description prior to the suggestive photo array; (4) the level of certainty in identifying the perpetrators; and (5) the lapse of time between the crime and the legal confrontation. See Commonwealth v. Spencer, supra, 826.…
>
> After its review, the Court finds that the evidence introduced by the Commonwealth shows by a clear and convincing manner that there exists an independent basis for an in-court identification.

(Id. at 5).

In his direct appeal, Petitioner challenged the trial court's pre-trial suppression rulings. The Superior Court rejected this claim on the merits. (ECF No. 41-24, <u>Haskell 1</u>, No. 2205 Pittsburgh 1998, slip op. at 2-4).

### (b) Petitioner is not entitled to relief on this claim under AEDPA

In Claim D of the Amended Petition, Petitioner challenges the trial court's decision to permit the introduction of Blue's in-court identification. Because the Superior Court denied this claim on the merits, Petitioner cannot receive federal habeas relief on it unless he demonstrates that its decision was "contrary to" or "an unreasonable application of" "clearly established Federal law as determined by the Supreme Court of the United States" at the time the Superior Court issued <u>Haskell 1</u>,[12] § 2254(d)(1), or "resulted in a decision that was contrary to, or involved an unreasonable determination of the facts in light of the evidence presented in the state court proceeding[,]" <u>id.</u> § 2254(d)(2). Petitioner does not address AEDPA's standard of review. It is his burden to overcome it, and he has not met his burden here.

"The test for § 2254(d)(1)'s 'contrary to' clause is whether the state court decision 'applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of [the Supreme] Court but reaches a different result.'" <u>Rountree v. Balicki</u>, 640 F.3d 530, 537 (3d Cir. 2011) (quoting <u>Brown v. Payton</u>, 544 U.S. 133, 141 (2005), which cited <u>Williams v. Taylor</u>, 529 U.S. 362, 405 (2000) and <u>Woodford v. Visciotti</u>, 537 U.S. 19, 24-25 (2002)). The state court's adjudication of Claim D withstands review under the first clause of § 2254(d)(1) because Petitioner has not demonstrated it was "contrary to" <u>Neil v. Biggers</u>, 409

---

[12]     "[Section] 2254(d)(1) requires federal courts to focus on what a state court knew and did, and to measure state-court decisions against this Court's precedents as of the time the state court renders its decision." <u>Greene v. Fisher</u>, — U.S. —, 132 S.Ct. 38, 44 (2011) (internal quotations and citations omitted).

U.S. 188 (1972), <u>Manson v. Brathwaite</u>, 432 U.S. 98 (1977) and other applicable Supreme Court

jurisprudence. <u>Williams</u>, 529 U.S. at 406 ("a run-of-the mill state-court decision applying the correct

legal rule from [Supreme Court] cases [does] not fit comfortably within § 2254(d)(1)'s 'contrary to'

clause.").

      Establishing that the state court's adjudication of Claim D was an "unreasonable application of

Federal law as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), also is a

very difficult burden to meet. <u>Richter</u>, 562 U.S. at 102 ("It bears repeating that even a strong case for

relief does not mean the state court's contrary conclusion was unreasonable. If this standard is difficult to

meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a

complete bar on federal court relitigation of claims already rejected in state proceedings.") "[U]nder

AEDPA, the question 'is not whether a federal court believes the state court's determination 'was

incorrect, but whether that determination was unreasonable – a substantially higher threshold.'"

<u>Rountree</u>, 640 F.3d at 540 (quoting <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123 (2009), which quoted

<u>Schriro</u>, 550 U.S. at 473). The Supreme Court has instructed that § 2254(d)(1)'s "unreasonable

application" clause:

> preserves authority to issue the writ in cases where there is no possibility fairminded
> jurists could disagree that the state court's decision conflicts with this Court's precedents.
> It goes no farther…. *As a condition for obtaining habeas corpus from a federal court, a
> state prisoner must show that the state court's ruling on the claim being presented in
> federal court was so lacking in justification that there was an error well understood and
> comprehended in existing law beyond any possibility for fairminded disagreement.*

<u>Richter</u>, 562 U.S. at 102-03 (emphasis added). <u>See also</u> <u>White v. Woodall</u>, — U.S. — , 134 S.Ct. 1697,

1706-07 (2014) ("The critical point is that relief is available under § 2254(d)(1)'s unreasonable-

application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of

facts that there could be no 'fairminded disagreement' on the question, <u>Harrington [v. Richter]</u>, 562 U.S.,

at —, 131 S.Ct., at 787.") Petitioner has not met his burden of demonstrating that the state court's adjudication of Claim D "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103.

Finally, the test for § 2254(d)(2)'s "unreasonable determination of facts" clause:

is whether the petitioner has demonstrated by "clear and convincing evidence," § 2254(e)(1), that the state court's determination of the facts was unreasonable in light of the record. See Rice v. Collins, 546 U.S. 333, 338-339 (2006) ("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'") (quoting § 2254(e)(1)) (citing Miller-El v. Dretke, 545 U.S. 231, 240 (2005)); see also Simmons v. Beard, 590 F.3d 223, 231 (3d Cir. 2009) ("Under the § 2254 standard, a district court is bound to presume that the state court's factual findings are correct, with the burden on the petitioner to rebut those findings by clear and convincing evidence."). Importantly, the evidence against which a federal court measures the reasonableness of the state court's factual findings is the record evidence at the time of the state court's adjudication. Cullen v. Pinholster, — U.S. — [ ], 131 S.Ct. 1388, 1401-03 (2011).

Rountree, 640 F.3d at 537-38 (parallel citations omitted). More recently, the Supreme Court has explained that "[w]e have not defined the precise relationship between § 2254(d)(2) and § 2254(e)(1)[.]... For present purposes, it is enough to reiterate 'that a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" Burt v. Titlow, — U.S. —, 134 S.Ct. 10, 15 (2013) (quoting Wood v. Allen, 558 U.S. 290, 301 (2010)). Petitioner has not demonstrated that the state court's decision was an "unreasonable determination of the facts" under § 2254(d)(2).

Because Petitioner has not overcome AEDPA's standard of review,[13] Claim D is denied.

_____

[13]     If the Court could review Claim D *de novo*, it would still be denied. Petitioner argues that Blue's trial testimony establishes that, contrary to her suppression hearing testimony, she knew his real name because she admitted that she saw reports of his arrest in the news. This argument fails because, as the state court held, even if the photographic line-up was unduly suggestive with respect to Blue, her in-court identification was not a violation of Petitioner's due process rights because she had an independent basis for her identification. Moreover, because the admission of Blue's identification at trial *Continued on next page…*

36

**4.    Claim E – Ineffective Assistance of Trial Counsel**

In Claim E(i) and (ii), Petitioner contends that Moore provided him with ineffective assistance of counsel for two specific reasons discussed below. (Amended Petition, ECF No. 41 at 31-34). Respondents contend that Petitioner did not exhaust his state court remedies with respect to either ineffective assistance claim and that, as a result, each claim is procedurally defaulted. Petitioner counters that each claim fell within the allegations of ineffective assistance that he raised in his first PCRA petition. He also argues that if this Court does not accept that argument, it still should address these claims on the merits because any procedural default of them occurred as a result of the state-created impediment to him filing a timely PCRA petition.

The Court need not resolve the complex issue of procedural default as it applies to these two ineffective assistance claims. Because they fail on the merits, they can be denied on that basis without regard to whether they are procedurally defaulted. Evaluating the claims in this manner calls for a straightforward application of the test for ineffective assistance of counsel set forth in <u>Strickland v. Washington,</u> 466 U.S. 668 (1984).

<u>Strickland</u> recognized that the Sixth Amendment's guarantee that "[i]n all criminal prosecutions, the accused shall enjoy the right … to have the Assistance of Counsel for his defence" entails that defendants are entitled to be represented by an attorney who meets at least a minimal standard of competence. <u>Id.</u> at 685-87.   "[T]he Sixth Amendment does not guarantee the right to perfect counsel; it

---

did not have a "substantial and injurious effect or influence in determining the jury's verdict[,]" it's admission, even if it rose to the level of a due process error, was harmless. For the reasons already discussed, the Court is not in grave doubt that the introduction of Blue's in-court identification had a "substantial and injurious effect or influence" on the jury's verdicts. <u>Brecht</u>, 507 U.S. at 638.

promises only the right to effective assistance[.]" <u>Titlow</u>, 134 S.Ct. at 17 (quoting <u>Strickland</u>, 466 U.S. at 690, 687).

To prevail on a claim of ineffective assistance under <u>Strickland</u>, Petitioner has the burden of establishing that Moore's representation fell below an objective standard of reasonableness. 466 U.S. at 688. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." <u>Id.</u> at 687. Importantly, the Supreme Court has emphasized that "counsel should be 'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment[.]'" <u>Titlow</u>, 134 S.Ct. at 17 (quoting <u>Strickland</u>, 466 U.S. at 690). <u>Richter</u>, 562 U.S. at 104 ("A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance.") (quoting <u>Strickland</u>, 466 U.S. at 689).

<u>Strickland</u> also requires that Petitioner demonstrate that he was prejudiced by Moore's alleged deficient performance.[14] This places the burden on him to establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694. As the Court of Appeals for the Third Circuit has explained:

> [The petitioner] "need not show that counsel's deficient performance 'more likely than not altered the outcome of the case' – rather, he must show only 'a probability sufficient to undermine confidence in the outcome.'" <u>Jacobs v. Horn</u>, 395 F.3d 92, 105 (3d Cir. 2005) (quoting <u>Strickland</u>, 466 U.S. at 693-94). On the other hand, it is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." <u>Harrington [v. Richter]</u>, 131 S.Ct. at 787 (citing <u>Strickland</u>, 466 U.S. at 693). Counsel's errors must be "so serious as to deprive the defendant of a fair trial." <u>Id.</u> at 787-88 (citing

---

[14]    The Supreme Court in <u>Strickland</u> noted that although it had discussed the performance component of an effectiveness claim prior to the prejudice component, there is no reason for an analysis of an ineffectiveness claim to proceed in that order. 466 U.S. at 697. Consequently, if it is more efficient to dispose of an ineffectiveness claim on the ground that the petitioner failed to meet his burden of showing prejudice, this course should be followed. <u>Id.</u>

Strickland, 466 U.S. at 687). The likelihood of a different result must be substantial, not just conceivable. Id.

Brown v. Wenerowicz, 663 F.3d 619, 630 (3d Cir. 2011).

In his first claim of trial counsel ineffectiveness (Claim E(i)), Petitioner contends that Moore provided him with constitutionally deficient representation because he should have renewed the motion to suppress after Blue testified at trial that she saw reports of Petitioner's arrest in the news. He argues that if Moore would have done so, it is "inconceivable" that the trial court "would have found the photographic line-up not to be suggestive." (Amended Petition, ECF No. 41 at 31-32). This claim has no merit. The trial court denied Petitioner's pre-trial motion to suppress because, even if the photographic line-up was suggestive, Blue's in-court identification of Petitioner was reliable enough to be introduced at trial because she had an independent basis upon which to ground her identification. Because Petitioner has not met his burden of showing that Moore's complained-of conduct fell below an objective standard of reasonableness or that "there is a reasonable probability that, but for" Moore's challenged conduct, the result of his trial "would have been different[,]" Strickland, 466 U.S. at 694, Claim E(i) is denied.

In Claim E(ii), Petitioner contends that Moore was ineffective for failing to adequately cross-examine Blue to reveal the inconsistencies between her testimony and that of the other witness in Jethroe's on the night of the shooting, and to impeach her testimony with inconsistent statements she made at the preliminary hearing. This claim is denied because even if the Court accepts Petitioner's contention that Moore was ineffective on the grounds alleged in the Amended Petition, there was no prejudice. For the reasons already discussed, Petitioner has not met his burden of establishing that, if Moore had successfully impeached Blue's testimony, "there is a reasonable probability" the result of his trial "would have been different." Strickland, 466 U.S. at 694. Therefore, Claim E(ii) is denied.

**Certificate of Appealability**

28 U.S.C. § 2253 governs the issuance of a certificate of appealability for appellate review of a district court's disposition of a habeas petition. It provides that "[a] certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right." Where the district court has rejected a constitutional claim on its merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000). Applying that standard here, jurists of reason would not find it debatable whether each of Petitioner's claims should be denied. Accordingly, a certificate of appealability is denied as to each claim.

## II.

For the reasons set forth above, the petition for a writ of habeas corpus is denied and a certificate of appealability is denied with respect to all claims.

An appropriate Order follows.

/s/ Susan Paradise Baxter

Dated: September 8, 2015                SUSAN PARADISE BAXTER
United States Magistrate Judge